# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| NATIONAL BEDDING COMPANY, L.L.C., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> AMERICAN REALTY CAPITAL, L.L.C., ) <br> ) <br> Defendant. ) | Case No. 08-cv-6552 <br><br> Judge Robert M. Dow, Jr. |

## MEMORANDUM OPINION AND ORDER

This action arises out of a Purchase and Sale Agreement ("PSA") between Plaintiff National Bedding Company, L.L.C. ("NBC") and Defendant American Realty Capital, L.L.C ("ARC"). Under the PSA, NBC agreed to complete the construction of its headquarters in Hoffman Estates, Illinois, and then sell the building to ARC, which would then lease it back to NBC. On December 14, 2009, NBC filed a two-count amended complaint, alleging that ARC defaulted under the terms of the PSA and seeking (i) a declaratory judgment stating that NBC is entitled to receive the balance of funds held in an earnest money deposit as liquidated damages for ARC's default under the PSA; and (ii) damages for ARC's alleged breach of the purchase and sale agreement that include $416,500.00 in funds that ARC withdrew from the escrow fund, along with interest and attorney's fees. NBC has moved for summary judgment [35] on both counts. For the following reasons, the Court grants NBC's motion for summary judgment [35].

## I. Background

The Court takes the relevant facts primarily from the parties' Local Rule ("L.R.") 56.1 statements:[1] NBC's L.R. 56.1(a)(3) Statement of Undisputed Material Facts ("Pl. SOF"), ARC's

---
[1] L.R. 56.1 requires that statements of facts contain allegations of material fact and that factual allegations be supported by admissible record evidence. *See* L.R. 56.1; *Malec v. Sanford*, 191 F.R.D.

Response to Plaintiff's L.R. 56.1(a)(3) Statement of Undisputed Material Facts ("Def. Resp. Pl. SOF") and ARC's Statement of Facts Requiring Denial of Summary Judgment ("Def. SOF"), and NBC's Response to Defendant's L.R. 56.1(a)(3) Statement (Pl. Resp. Def. SOF).

### A. The Purchase and Sale Agreement

In 2006, NBC began constructing a new international headquarters (the "Building") that that initially was scheduled for completion no later than December 19, 2007. Pl. SOF ¶ 25. On February 16, 2007, NBC and ARC entered into the PSA, which created a sale and lease-back transaction in which NBC agreed to complete construction of the Building and then sell it, along with related property interests, to ARC, who would then lease the Building back to NBC. *Id.* ¶ 8. The parties agreed to a purchase price of $28,000,000.00 and arranged for ARC to deposit earnest money totaling $1,000,000.00 of the purchase price into escrow (the "Escrow"). *Id.* ¶ 9. The balance of the purchase price was due at closing, but the PSA allowed ARC to withdraw $29,750.00 a month (beginning on April 17, 2007) from the Escrow to secure financing for the full purchase price. *Id.* ¶ 10. ARC exercised this provision and withdrew approximately $416,500.00.[2]

Section 3.1 of the PSA, which required ARC to make an earnest money deposit, states that ARC's deposit is non-refundable after the initial due-diligence period (up to March 19, 2007) "unless the Transaction fails to close due solely to (a) default by [NBC] under this Agreement, as provided in Section 11.2 hereof, or (b) termination of this Agreement pursuant to

---

581, 583-85 (N.D. Ill. 2000). Where a party has offered a legal conclusion or a statement of fact without offering proper evidentiary support, the Court will not consider that statement. See, *e.g.*, *Malec*, 191 F.R.D. at 583. Additionally, where a party improperly denies a statement of fact by failing to provide adequate or proper record support for the denial, the Court deems that statement of fact to be admitted. See L.R. 56.1(a), 56.1(b)(3)(B); see also *Malec*, 191 F.R.D. at 584.

[2] It is this amount, in addition to the balance of the Escrow, which NBC seeks as liquidated damages under § 11.1 of the PSA.

2

Section 9.3.4, Section 10.2, and Article 12 hereof." Def. SOF ¶ 1 (emphasis in original). Section 9.3.4 and Article 12 are not at issue here;[3] however, the parties do contest the applicability of § 10.2. Section 10.2 provides that

> Seller shall use good faith efforts to cause Substantial Completion to occur no later than the Target Completion Date. If Substantial Completion has not occurred by the Target Completion Date * * * Buyer may at any time thereafter require Seller to close on seven (7) days' notice to Seller. If Closing occurs prior to Substantial Completion, Seller shall (i) after Closing complete the work necessary to achieve Substantial Completion, (ii) provide Buyer and its leader a guarantee to complete such work, and (iii) indemnify and hold Buyer and its lender harmless from any liability that arises out of Seller performing the work necessary to complete the Improvements. As an additional security for the performance of such work, at Closing, Seller shall deposit into escrow with the Buyer's lender, to be held and disbursed by it post-Closing in accordance with the terms hereinafter set forth, pursuant to an agreement to be executed at Closing in form reasonably satisfactory to Seller, Buyer and Buyer's lender, and amount equal to 125% of the cost of completing any items that remain uncompleted as of the Closing Date (which cost shall be subject to the reasonable approval of Buyer and its lender).

Pl. SOF, Ex. 2. Thus, pursuant to the terms of the PSA, NBC was required to "use good faith efforts" to substantially complete the Building by December 1, 2007.[4] See also Pl. SOF ¶ 14, 23. In the event that the Building was not substantially complete by December 1, the PSA allowed ARC, "at any time thereafter," to require NBC to close on seven day's notice. Pl. SOF, Ex. 2. Alternatively, ARC was entitled to wait until Substantial Completion occurred and then close within ten days. Pl. SOF ¶ 11-12.

---

[3] Section 9.3.4 covers material misrepresentations and untrue warranties by NBC, while Article 12 includes provisions for condemnation and casualty. Pl. SOF Ex. 2.

[4] Article I of the PSA defines the requirements for "Substantial Completion," including: "completion of Improvements in a good and workmanlike manner and in accordance with applicable Laws and with the Plans and Specifications, subject to Approved Change Orders, as conclusively evidenced by delivery" to ARC or a written notice from NBC stating that Substantial Completion has occurred; a conditional certificate of occupancy; an architect's Certificate of Substantial Completion; the Title Commitment and an as-built Survey showing the completed Improvements; and a certificate from NBC stating that NBC has accepted the Improvements for occupancy. Pl. SOF ¶ 13.

Section 11.2 sets out the conditions and consequences of any default by NBC as follows:

> If, *at the closing*, (i) Seller is in default of any of its obligations hereunder, or (ii) any of Seller's representations or warranties are untrue in any material respect, or (iii) the Closing otherwise fails to occur by reason of Seller's failure or refusal to perform its obligations hereunder in a prompt and timely manner, then Buyer may elect, as its sole and exclusive remedy, to (a) terminate this Agreement in its entirety by written notice to the Seller, promptly after which the Deposit shall be returned to Buyer, Seller shall reimburse Buyer for its out-of-pocket costs incurred in connection with the transaction contemplated hereby not to exceed $100,000, and Seller shall pay to Buyer an amount equal to that portion of the Deposit that was withdrawn pursuant to Section 3.1 above and used to pay the forward rate lock fee, or (b) waive the condition and proceed to close the Transaction, or (c) seek specific performance of this Agreement by the Seller. As a condition precedent to exercise by Buyer of any right Buyer may have to bring an action for specific performance hereunder, Buyer must commence such an action for specific performance within sixty (60) days after the occurrence of Seller's default. * * * The provisions of this Section 11.2 are not intended to limit Buyer's rights or remedies with respect to ay claim of fraud by Seller.

Pl. SOF, Ex. 2 (emphasis added). The PSA also stipulated that "[i]n any action between [ARC and NBC] as a result of failure to perform or a default under this Agreement, the prevailing party shall be entitled to recover * * * attorney's fees and disbursements and court costs included in such action." Pl. SOF, Ex. 2; Def. Resp. Pl. SOF ¶ 19. The parties agreed that Illinois law would govern any dispute concerning the PSA and that they would waive their right to a jury trial. Pl. SOF, Ex. 2 at §§ 14.5, 14.7.

### B. The Delay and Termination of the PSA

The specific controversy between the parties originated in construction delays that pushed the completion date well beyond December 2007. The parties agree that there were two primary reasons for the delay: First, a subcontractor failed to deliver the exterior glass to the construction site until March 2008, nine months after it had been scheduled to arrive. Pl. SOF ¶ 33-34. Second, weather hampered efforts to complete construction, although the impact of the weather was exacerbated by the absence of a glass exterior, which made it harder to complete

4

internal work on schedule. *Id*. ¶ 35. The dispute between the parties relates mainly to NBC's actions in the face of these delays and the extent to which each party fulfilled its other obligations under the PSA. ARC asserts that NBC's failure to accelerate the delivery of the exterior glass or to affirmatively seek alternative sources fell short of a "good faith effort to cause Substantial Completion" before the target date of December 1, 2007, as the PSA requires. Def. Resp. Pl. SOF ¶ 38. Meanwhile, NBC asserts that it was in regular contact with the glass company (Elston Glass) to urge immediate delivery of the delayed components and that it went to extra lengths to ensure that interior construction could continue through the winter months, despite the missing exterior. Pl. SOF ¶ 34-35. Furthermore, NBC asserts that its employees considered the possibility of ordering glass from a new subcontractor but concluded that doing so would only further delay the construction of the Building. *Id.* ¶ 37. ARC does not dispute that NBC went to great lengths to keep ARC appraised of the construction status by forwarding numerous reports and photographs showing the process at the work site. *Id*. ¶ 39.

In November 2007, it became clear that the Building would not be substantially completed by December 2007, which had several immediate consequences. NBC was forced to exercise an extension on the lease for its existing headquarters, resulting in an increase in monthly rent. *Id*. ¶ 40. NBC also had to pay a $250,000 penalty to Sears, its original lessor, for failure to obtain a certificate of occupancy by December 31, 2007. *Id.* As a result of the delay, ARC initially decided to exercise its rights under § 10.2 of the PSA and to close the transaction on December 21, 2007, prior to Substantial Completion; however, ARC withdrew this demand on December 3, 2007, and notified NBC that instead it would await Substantial Completion of the construction of the Building, which it expected to occur in the second quarter of 2008. *Id*. ¶ 41-43. ARC's e-mail to NBC states:

> On reflection, we have decided not to close on the transaction on December 21, but rather to follow our original agreement and close 10 business days following 'substantial completion' of Serta's headquarters, as that term is defined in the Purchase and Sale Agreement. We will continue to monitor the construction progress and expect 'substantial completion' to occur sometime in the second quarter of 2008.

Pl. SOF, Ex. 3E.

By the end of April 2008, the Building was sufficiently complete for NBC to take partial occupancy, and on the April 28, NBC notified ARC that NBC proposed to close on the transaction on June 30, 2008.[5] Then next day, on April 29, 2008, ARC tentatively agreed to a closing date of June 30, 2008: "Good morning. Tentatively June 30, 2008 looks OK. I will have to coordinate this with New York and will let you know if there is any problem. In the meantime, I will start working toward that date." Pl. SOF, Ex. 3G.

This agreement was short-lived. On May 15, 2008, ARC notified NBC that ARC had lost its financing commitment from Bear Stearns and was not in a position to close on the transaction on the terms set out in the PSA. *Id*. ¶ 46; see also Pl. SOF, Ex. 3H. In other words, ARC could not secure a replacement lender that was ready to underwrite a mortgage on similar terms. ARC proposed to alter the terms of the PSA and presented NBC with three options: (1) reduce the purchase price to $26,687,000.00; (2) maintain the original purchase price while allowing fixed rent increases of 2.25% over the 20-year initial term of the lease instead of the original, flat annual rent of $2,135,000; or (3) terminate the PSA and return the Escrow to ARC along with $357,000.00 in rate lock fees and $36,400.00 in out-of-pocket costs. Pl. SOF Ex. 3H. NBC declined to make any of these adjustments. Meanwhile, on June 23, 2008, NBC's architect certified that the Building was substantially complete. *Id*. ¶ 47.

---

[5] In the e-mail dated April 28, 2008, NBC notified ARC that it was "now occupying the Research Center. The move to occupy the balance of the building will take place mid June. We would like to schedule closing on the building for Monday June 30, 2008. That gives us over 60 days from now. How does this look for you?" Pl. SOF, Ex. 3F.

6

In a letter dated July 16, 2008, ARC purported to terminate the PSA on the grounds that NBC had failed to achieve Substantial Completion "prior to or within a reasonable time after December 1, 2007, the scheduled date for Substantial Completion" and had refused "to modify the transaction on mutually acceptable terms in order to permit the transaction to go forward." Def. SOF ¶ 48. ARC did not allege that NBC had failed to use good faith efforts to achieve Substantial Completion by December 1, 2007; rather, its sole basis for terminating the PSA was its contention that NBC failed to substantially complete the improvements within a reasonable time. *Id*. ¶ 49. NBC responded immediately, notifying ARC that Substantial Completion had occurred and providing ARC with a Phased Occupancy Permit, an architect's Certificate of Substantial Completion, and a Title Commitment and as-built survey. *Id*. ¶ 50. NBC also contested ARC's purported termination of the PSA. *Id*. ¶ 51.

In late August and early September 2008, the parties attempted to settle their dispute, but on September 15, NBC terminated the discussions and informed ARC that it intended to schedule the closing for September 29, 2008. *Id*. ¶ 53-54. After ARC failed to deposit the balance of the purchase price (or any of the other deliveries required by the PSA) on that date, NBC provided written notice that it intended to terminate the PSA. *Id*. ¶ 57-8. NBC also asserted its right to the balance of the funds in the Escrow account.[6] NBC made a demand upon the Escrowee to release to NBC the balance of ARC's $1,000,000.00 earnest money deposit remaining in the Escrow (as liquidated damages). ARC objected to the release of the deposit,

---

[6] ARC withdraw a total of $416,500 from the Escrow, purportedly to pay its lender, Bear Stearns, a monthly forward rate lock fee. Between March 2007 and November 2007, ARC transmitted a total of $952,000 to Bear Stearns for a rate lock deposit to secure financing of the PSA. On November 27, 2007, Bear Stearns returned to ARC the entire $952,000 rate lock deposit that ARC paid to Bear Stearns. ARC has not returned any of the funds that it withdrew from the Escrow account. ARC's rate lock deposit agreement with Bear Stearns expired on April 1, 2008. ARC continued to make monthly withdrawals from the Escrow through May 15. ARC did not pay any rate lock fees to any lender other than Bear Stearns.

and the Escrowee has declined to release the funds to either party pending receipt of a court order adjudicating the parties' rights to the funds. In November 2008, NBC filed the present suit seeking a declaratory judgment and the award of the $416,500 in funds that ARC had already withdrawn from the Escrow.

## II.     Legal Standard on Summary Judgment

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id*. at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which

the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Where the terms of a contract are unambiguous, its interpretation is a matter of law that may be decided on summary judgment. *Cherry v. Auburn Gear, Inc.*, 441 F.3d 476, 481 (7th Cir. 2006); *Wells Fargo Fin., Inc. v. Daum*, 2007 U.S. Dist. LEXIS 67006 at *10 (N.D. Ill. Sept. 10, 2007).

**III.  Analysis**

Under Illinois law, "[c]onstruing the language employed in a contract is a matter of law appropriate for summary judgment * * * unless the contract is ambiguous." *Burris v. Memorial Consultants, Inc.*, 224 Ill. App. 3d 653, 656 (3d Dist. 1992); see also *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100, 129 (2005) ("As a general rule, the construction, interpretation, or legal effect of a contract is a matter to be determined by the court as a question of law"). In contract interpretation cases, Illinois generally adheres to the "four corners" rule, which provides that "'an agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used. It is not to be changed by extrinsic evidence.'" *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 462 (1999) (quoting *Western Ill. Oil Co. v. Thompson*, 186 N.E.2d 285, 287 (Ill. 1962)); see also *In re Marriage of Best*, 369 Ill. App. 3d 254, 266 (2d Dist. 2006) ("A court's primary goal in the construction of a contract is to decide and give effect to the intent of the parties as it is expressed through the words of the contract"). "A contract is ambiguous only if it is reasonably susceptible of different constructions; it is not ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends; contracts are not rendered ambiguous merely because the parties do not agree upon their proper

9

construction." *American States Ins. Co. v. A.J. Maggio Co., Inc.*, 593 N.E.2d 1083, 1086 (Ill. App. Ct. 2d Dist. 1992).

NBC alleges that ARC beached the PSA when it purported to terminate the Agreement and failed to pay the purchase price and fulfill its other responsibilities at closing. Under Illinois law, to establish breach of contract, NBC must show: (1) a valid and enforceable contract; (2) NBC's performance of its contractual duties; (3) ARC's breach of its contractual duties; and (4) damages. *Olympic Chevrolet, Inc. v. General Motors Corp.*, 959 F. Supp. 918, 922 (N.D. Ill. 1997) (citing *Hickox v. Bell*, 552 N.E.2d 1133, 1143 (Ill. App. 1990)).[7] ARC has admitted that the PSA is a valid and enforceable contract but contests the remaining three elements. See Def. Resp. Pl. SOF ¶ 8. The Court addresses each element in turn.

### A. NBC's Performance Of Contractual Duties

ARC contends that summary judgment is not appropriate because it was justified in terminating the contract due to NBC's failure to satisfy its obligations in a prompt and timely manner. ARC contends that the PSA, viewed as a whole, did not limit ARC to the remedies listed under § 10.2; rather, ARC contends that § 11.2 allowed ARC to elect to "terminate the Agreement in its entirety" or "waive the condition and proceed to close the Transaction" if NBC defaulted on any of its obligations prior to closing or if closing fails to occur because of Seller's "failure or refusal to perform its obligations * * * in a prompt and timely manner." Pl. SOF, Ex. 2. Since the remedies under both sections are permissive, not mandatory, ARC argues that it was entitled to compel an early closing under § 10.2 *or* to terminate the PSA under the terms of § 11.2. In support of its position that NBC failed to perform its duties in a prompt and timely manner, ARC points to NBC's delay in achieving substantial completion until July 18, 2008, and its failure to perform its obligations within a reasonable time after December 1, 2007.

---

[7] The parties do not dispute that Illinois substantive law governs.

10

Reviewing the terms of the PSA that were agreed to by the parties, the Court declines to adopt ARC's strained interpretation of the PSA. The parties clearly anticipated the possibility that the target date for substantial completion might be pushed back. Section 10.2 specifically addressed what would happen if substantial completion was not completed by the target date. It did not give ARC the option to terminate the agreement, as ARC urges, but rather allowed ARC to elect to close the transaction in spite of such a delay – an option that ARC initially exercised in November 2007, but then withdrew. ARC argues that § 3.1 provides a right to terminate under § 10.2. Even if the reference in § 3.1 to termination under § 10.2 can be read to create a termination right that is not expressed in § 10.2 itself, of which the Court is doubtful (see *Preuter v. State Officers Electoral Board*, 779 N.E.2d 322, 332 (Ill. App. Ct. 2002) (quoting *Continental Casualty Co. v. Polk Bros., Inc.*, 457 N.E.2d 1271, 1274 (Ill. App. Ct. 1983)) ("[i]t is well-established that 'where a document contains both general and specific provisions relating to the same subject, the specific provision is controlling.'")), the only obligation imposed on NBC by § 10.2 is to use good faith efforts to achieve Substantial Completion by December 1, 2007. If ARC had a right to terminate under § 10.2, it would be unreasonable to interpret that to be a floating right to terminate whenever ARC decided that termination was appropriate – in this instance, when its financing problems rendered its performance financially disadvantageous. Rather, the right would have accrued on December 1, 2007, and ARC did not exercise its right. Furthermore, based on the language of § 10.2, that right still would be contingent on a showing, by ARC, that NBC did not use good faith efforts to achieve Substantial Completion by the target date.

Perhaps realizing that its cross-interpretation of §§ 3.1 and 10.2 fails to defeat summary judgment, ARC contends that § 10.2 was not ARC's only remedy, and that it also could

terminate the agreement under § 11.2. However, § 11.2 provides ARC with the option of terminating the PSA if NBC had delayed the *closing* of the transaction during this window. Section 11.2 provides: "If, *at the closing*, (i) Seller is in default of any of its obligations hereunder, or (ii) any of Seller's representations or warranties are untrue in any material respect, or (iii) the Closing otherwise fails to occur by reason of Seller's failure or refusal to perform its obligations hereunder in a prompt and timely manner, then Buyer may elect * * *" (emphasis added). The language in § 11.2 sets forth what is to happen in the event that the parties are set to close and NBC defaults or fails to perform on its obligations. However, ARC withdrew its initial election to close prior to Substantial Completion and agreed to wait to close once Substantial Completion had occurred. The undisputed facts show that ARC never requested another closing date and instead continued to wait until Substantial Completion of the Building occurred. Then, when it lost its financing commitment, it proposed three options for NBC to "consider," but none of those options was the option of closing. Thus, because ARC retracted its only demand to close prior to Substantial Completion, NBC satisfied its obligations under the PSA by continuing to work towards Substantial Completion of the building.

Furthermore, the only obligation that ARC contends NBC failed to achieve was Substantial Completion, and § 10.2 explicitly states what ARC's options were in the event that NBC did not meet the target completion date of December 1, 2007.[8] Section 11.2 governs what

---

[8] As previously set forth, even if ARC did have a right to terminate the PSA because of the delay in Substantial Completion, the evidence suggests that it waived that right. Waiver may be made by an express agreement or it may be implied from the conduct, acts or words of the party who is alleged to have waived a right. *Ryder v. Bank of Hickory Hills,* 585 N.E.2d 46, 49 (1991); see also *Delta Consulting Group, Inc. v. R. Randle Const., Inc.*, 554 F.3d 1133, 1140 (7th Cir. 2009) (affirming summary judgment for plaintiff on that ground that defendant waived its breach of contract claim by continuously accepting the consultant's performance, paying for it, and never once objecting to it). "An implied waiver may arise where a person against whom the waiver is asserted has pursued such a course of conduct as to sufficiently evidence an intention to waive a right or where his conduct is inconsistent with any other intention than to waive it." *Id.;* see also *PPM Finance, Inc., v. Norandal USA, Inc.,* 392 F.3d 889, 895

happens in the event the closing date was in place and NBC could not close, but given that ARC did not demand another closing after it retracted its demand in December 2007, the remedies in § 11.2 are not applicable.

Even if the remedies in § 11.2 applied, ARC does not identify any contractual obligations under the PSA that NBC failed to perform in a prompt and timely manner. Section 10.2 – the only specific provision relied upon by the parties that sets forth the expectations of the parties with regard to the timely completion of the project – did not require NBC to achieve Substantial Completion by the Target Completion Date. Instead, it required NBC *to use good faith efforts* to cause Substantial Completion. If ARC wanted § 11.2 to provide it with the absolute right to terminate the PSA for failure to achieve Standard Completion by the target date, then it should have bargained for the inclusion of that right, instead of a right to terminate contingent on NBC's good faith efforts. The Court cannot rewrite the PSA to give ARC a better deal than the one for which it bargained. See *Continental Mobile Telephone Co. v. Chicago SMSA Limited Partnership*, 587 N.E.2d 1169, 1173 (Ill. App. Ct. 1st Dist. 1992).

Having determined that neither § 3.1 or § 11.2 gave ARC the right to terminate the PSA under the facts presented, the parties' dispute over whether NBC performed its contractual duties

---

(7th Cir. 2004) (waiver implied when a party's conduct is inconsistent with an intention to assert that right). Where there is no dispute as to the material facts and only one reasonable inference can be drawn therefrom, it is a question of law whether the facts proved constitute waiver. *Wald v. Chicago Shippers Assoc.,* 529 N.E.2d 1138, 1147-48 (1988). In its e-mail of December 3, 2007, ARC notified NBC that, "on reflection, we have decided not to close on the transaction on December 21, but rather to follow our original agreement and close 10 business days following 'substantial completion' of Serta's headquarters, as that term is defined in the Purchase and Sale Agreement. We will continue to monitor the construction progress and expect 'substantial completion' to occur sometime in the second quarter of 2008." All of ARC's actions – (1) the agreement to close on the transaction after Substantial Completion (which it expected to occur in the second quarter of 2008), (2) the tentative agreement to close on June 30, 2008, (3) the failure to object to Substantial Completion in the second quarter of 2008, and (4) the failure to object to NBC's efforts to achieve Substantial Completion – clearly indicate its intention to waive any arguable right to terminate the agreement that it may have had in December 2007 on account of NBC's failure to achieve Substantial Completion by the target date.
.

boils down to whether NBC used good faith efforts to achieve substantial completion of the Building by the target completion date, December 1, 2007. Under Illinois law, good faith requires a party "vested with contractual discretion to exercise it reasonably and not arbitrarily or capriciously." *Theims Const. Co. v. State of Illinois*, 45 Ill. Ct. Cl. 267, 270 (1993) (citation omitted); see also *Greer Properties, Inc. v. LaSalle Nat'l Bank*, 874 F.2d 457, 460 (7th Cir. 1989) (quoting *Foster Enterprises, Inc. v. Germania Fed. Savings and Loan Ass'n*, 421 N.E.2d 1375, 1381 (Ill. App. 1981)). Good faith is "honest, lawful intent; the condition of acting without knowledge of fraud and without intent to assist in a fraudulent or otherwise unlawful scheme," *Theims Const.*, 45 Ill. Ct. C. at 270-71 (citing *Crouch v. First National Bank of Chicago*, 156 Ill. 342, 357 (1895). A court can decide the issue of good faith on summary judgment when the non-moving party fails to show specific evidence that creates a genuine issue of fact regarding the moving party's lack of good faith. *Capital Options Investments, Inc. v. Goldberg Bros. Commodities*, 958 F.2d 186, 189-91 (7th Cir. 1992) (affirming summary judgment for defendant where the plaintiff failed to point to specific facts raising an issue of fact regarding plaintiff's alleged bad faith); *Olympic Chevrolet v. GMC*, 959 F. Supp. 918, 924 (7th Cir. 1997) (to avoid summary judgment on the issue of good faith, the non-moving party "must come forward with specific evidence showing that there is sufficient evidence for a jury to find that [the moving party] abused its discretion.").

Here, ARC has not come forward with specific evidence that creates a genuine issue of fact regarding whether NBC exercised good faith. NBC received written assurances from its general contractor that the building would be move-in ready by December 18, 2007. NBC had a compelling financial stake in the matter because it faced a significant increase in rent and a one-time payment to Sears, its lessor, if it was not able to occupy the new Building by mid-December

14

2007.  Once it became apparent that the glass subcontractor was not going make an on-time delivery, NBC acted in good faith to minimize any delays.  NBC and its architect discussed the possibility of ordering glass from a new subcontractor, but concluded that doing so would only result in a longer wait.  *Id.*  ¶ 37.  NBC also incurred additional, unplanned construction costs when it constructed a temporary exterior so that work could continue on the interior of the building without the planned glass exterior.  *Id.* ¶ 35.  Furthermore, NBC kept ARC informed about the status of the project, including the glass delays.  *Id.* ¶ 39.

In response, ARC, although second-guessing the reasonableness of NBC's decisions, has not presented any evidence that NBC acted arbitrarily, capriciously, or dishonestly while it worked to complete the construction of the Building.  For instance, ARC contends that NBC should have foreseen weather delays and secured an earlier delivery of the glass or selected a new glass subcontractor.  But these arguments are not evidence of a lack of good faith effort.  At best, NBC may have been negligent, but negligence is not equivalent to a lack of good faith.  See *Doe v. Winny*, 764 N.E.2d 143, 153 (Ill. App. Ct. 2d Dist. 2002) ("We find the reasoning in [several] authorities persuasive and agree that evidence of negligence, standing alone, is insufficient to create a question of fact as to whether an individual acted with good faith").  ARC has not offered sufficient evidence that NBC exercised its discretion unreasonably or in a manner that was inconsistent with the reasonable expectations of the parties.  To the contrary, the undisputed evidence reveals that as of December 3, 2007, ARC expected substantial completion to occur in the second quarter of 2008 and it agreed to close on the transaction then.  For these reasons and because ARC does not allege any other breaches by NBC, the Court finds that there is no issue of material fact as to whether NBC breached its contractual duties to ARC.

### B. ARC's Breach of Its Contractual Duties

Having found that NBC fulfilled its contractual duties, the Court must examine whether ARC's July 16, 2008 termination letter constituted an anticipatory breach. "When a party bound by an executory contract gives notice of his intention not to comply with his obligations, the other contracting party may accept such notice as an anticipatory breach and treat the contract as ended without waiting for the completion of the contract by its terms." *First Nat'l Bank & Trust Co. v. First Nat'l Bank*, 533 N.E.2d 8, 13 (Ill. App. Ct. 1st Dist. 1988) (quoting *Stonecipher v. Pillatsch*, 332 N.E.2d 151, 153-54 (Ill. App. Ct. 2d Dist. 1975); see also *Builder's Concrete Co. v. Fred Faubel & Sons*, 373 N.E.2d 863, 868 (Ill. App. Ct. 3d Dist. 1978) ("When one party to a contract repudiates his contractual duties before time for performance the other party may elect to treat the contract as ended."). In an e-mail dated May 15, 2008, ARC explained that it had lost its financing with Bear Stearns and had been unable to secure a new mortgage on similar terms. PL. SOF, Ex. 3H. The e-mail then listed three "options" for NBC to consider, all of which involved material changes to the terms of the PSA. *Id.* After NBC refused to accept any of these options, ARC sent the July 16 Letter, which purported to terminate the PSA because of NBC's "failure to achieve Substantial Completion prior to or within a reasonable time after the scheduled date for Substantial Completion and [NBC's] refusal to modify the transaction on mutually acceptable terms in order to permit the transaction to go forward * * *."[9] *Id.* at Ex. 3J. In the following months, NBC continued to perform its obligations under the PSA in the hope that it might reach a settlement with ARC or close the transaction pursuant to the original terms. Pl. SOF ¶ 52-56. ARC nevertheless failed to produce the closing deliveries required by § 7.4 of the PSA, after which NBC formally terminated the PSA. *Id.* ¶ 57-58.

---

[9] At the time that ARC sent the letter of July 16, NBC's architect already had certified that the Building was substantially complete and NBC immediately provided ARC with an occupancy permit.

ARC argues that its May 15 e-mail did not constitute an anticipatory breach because it did not reveal an unequivocal manifestation of intent not to perform its duties under the PSA. See *Bituminous Casualty Corp. v. Commercial Union Ins. Co.*, 652 N.E.2d 1192, 1197 (Ill. App. 1995) ("[F]or there to be an anticipatory breach, [Illinois] law requires that there be a positive and unequivocal manifestation of a party's intent not to render the performance promised under the contract when the time fixed in the contract arrives."). Even if that is true as to the May 15 e-mail, the same cannot be said for ARC's July 16 letter of termination, which included the statement, "Buyer hereby terminates the Agreement, effective immediately." Pl. SOF, Ex. 3J. ARC also argues that anticipatory breach could not have occurred *after* the target completion date because anticipatory breach requires a manifestation of intent not to fulfill *future* contractual obligations; however, as explained above, the PSA anticipated the possibility that substantial completion would not occur by the target completion date and enumerated both parties' obligations in the event of that contingency.

Finally, ARC claims that its July 16 letter of termination was a legitimate exercise of its rights under § 11.2 of the PSA, which grants ARC the option to cancel the transaction "[i]f at the Closing (i) [NBC] is in default of any of its obligations hereunder, or (ii) any of [NBC's] representations or warranties are untrue in any material respect, or (iii) "the Closing otherwise fails to occur by reason of [NBC's] failure or refusal to perform its obligations hereunder in a prompt and timely manner." Pl. SOF, Ex. 2. But ARC has not shown (1) that it elected its right under § 10.2 "to close on seven (7) days' notice to Seller" once it withdrew its demand on December 3, 2008, and (2) that NBC failed to meet any obligation under the PSA that would have allowed it to terminate the agreement. As previously noted, the PSA did not require substantial completion by December 1, 2007; rather, it required NBC to use *good faith efforts* to

17

reach substantial completion by that date. Nor did NBC delay closing by failing or refusing to perform any of its obligations. As explained above, once the Target Completion Date passed, ARC was entitled to close the transaction with NBC at any time as long as it gave NBC seven days notice. See Pl. SOF., Ex. 2 at ¶10.2. Had ARC exercised this option and NBC failed to perform any of its obligations in closing the transaction, then the provisions of § 11.2 would have been applicable; however, ARC never sought to close the deal (after it withdrew its initial demand for closure in December 2007) and therefore had no justification for terminating the contract pursuant to § 11.2 on July 16, 2008.

    **C.    Damages**

Section 11.1 of the PSA provides that in the event of ARC's default, NBC "shall be entitled to retain the [Escrow] Deposit as liquidated damages, and thereafter neither party to this Agreement shall have any further rights or obligations hereunder other than any arising under any section herein that expressly provides that it survives the termination of this Agreement." Pl. SOF, Ex. 2; see also Def. Resp. Pl. SOF ¶ 18. Under Illinois law, liquidated damages provisions are presumptively enforceable, and ARC has not contested the validity of § 11.1. See *Crown Products, Inc. v. Wilkinson Mfg. Co.*, 1991 U.S. Dist. LEXIS 17166, at *7 (N.D. Ill. Nov. 26, 1991) ("Illinois places the burden of proving a liquidated damages clause void as a penalty on the party resisting its enforcement.") (citing *Pav-Saver Corp., v. Vasso Corp.*, 493 N.E.2d 423, 427 (Ill. App. Ct. 3d Dist. 1986)). Accordingly, NBC is entitled to receive the balance of the funds held in Escrow as liquidated damages for ARC's default.[10]

---

[10] The PSA also contains an attorneys' fees provision: "In any action between Buyer and Seller as a result of failure to perform or a default under this Agreement, the prevailing party shall be entitled to recover from the other party, and the other party shall pay to the prevailing party, the prevailing party's attorneys' fees and disbursements and court costs incurred in such action." Pl. SOF, Ex. 2 at § 14.12 of the PSA. NBC has indicated that it intends to file a petition for attorneys' fees and costs in the event that the Court grants summary judgment in its favor.

The only complication concerns those funds (approximately $416,500.00) that ARC withdrew from the Escrow to pay its lender, Bear Stearns, the monthly forward rate lock fee to secure financing of the PSA. Def. Resp. Pl. SOF 61-66. According to ARC, the PSA is silent as to what would happen if, as here, ARC's mortgager returned the rate lock fee. However, § 3.1 of the PSA stipulates that the funds withdrawn from the Escrow are "for the purpose of paying a forward rate lock fee payable with respect to reserve funds to be used to pay the Purchase Price * * *." Pl. SOF, Ex. 2. Once Bear Stearns returned the entire $952,000 rate lock free to ARC on November 27, 2007, any previously withdrawn funds from the Escrow were not used for the purpose of paying a forward rate lock fee and should have been returned to the Escrow. It also is undisputed that ARC continued to withdraw funds from the Escrow through May 15, 2008 – after Bear Stearns had returned the full rate lock deposit to ARC. Because ARC did not, in the end, use the withdrawn funds for their stated purpose, they comprise part of the Escrow deposit to which NBC is entitled as liquidated damaged for ARC's default under § 11.1.

## IV. Conclusion

For the forgoing reasons, NBC's Motion for Summary Judgment [35] is granted on both counts of the amended complaint.[11] NBC is given twenty-one days to submit a petition for attorneys' fees and costs; ARC is given fourteen days to file any objection to NBC's petition.

Dated: September 27, 2010   _____
Robert M. Dow, Jr.
United States District Judge

---

[11] In view of the Court's ruling, ARC's counterclaims appear to be moot. The Court gives ARC twenty-one days to show cause why judgment should not be entered in NBC's favor on ARC's counterclaims.